# United States Court of Federal Claims
No. 14-304 L, 14-1120 L
Filed: January 10, 2019

|  |  |
|---|---|
| ALFORD ET AL., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

*Sheldon G. Alston*, Brunini, Grantham, et al., Jackson, Mississippi, attorney for plaintiffs.

*Barrett Blake Teller*, Teller Hassel and Hopson, LLP, Vicksburg, Mississippi, attorney for consolidated plaintiff.

*William James Shapiro*, United States Department of Justice, Environmental & Natural Resources Division, Sacramento, California, attorney for defendant.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

     This action comes before the Court following trial held from January 25, 2018, until February 1, 2018.  Plaintiffs own properties surrounding Eagle Lake and brought this Complaint against the Army Corps of Engineers ("Corps") for damage to their individual properties after the flooding of Eagle Lake.  *See generally* Amended Complaint (hereinafter "Compl."). Plaintiffs filed their Post-Trial Briefs on April 10, 2018, seeking $374,973.50 in damages from defendant.  *See generally* Plaintiffs' Post-Trial Brief (hereinafter "Pls.' Brief").  Defendant filed its Post-Trial Brief on May 25, 2018, disputing plaintiffs' allegations.  *See generally* Defendant's Post-Trial Brief (hereinafter "Def.'s Brief").  For the reasons set forth below, the Court rules in favor of plaintiffs and awards plaintiffs, collectively, $168,000, plus interest, in damages.

    **I.**    **Background**

     This case is somewhat unique but based on a fairly simple set of facts.  Plaintiffs owned property on Eagle Lake, an oxbow lake located about fifteen miles from Vicksburg, Mississippi. *See* Joint Exhibit (hereinafter "Joint Ex.") 46 at 12; Defendant's Exhibit (hereinafter "Def. Ex.") 40 at 10; Trial Transcript (hereinafter "Tr.") 57:1–3.  In 2000, the Corps and various state agencies signed the Eagle Lake Water Level Management Agreement ("Eagle Lake

Agreement"), setting a schedule for raising and lowering the water level in Eagle Lake. Joint Ex. 80. The Eagle Lake Agreement specified that the water levels in the Lake be kept between 70 feet and 76.9 feet. *Id.*; Tr. 143:6–8. The predictable water levels in Eagle Lake allowed residents to build piers, boat houses, and docks extending out from the shore. *See* Tr. 143:12–19.

On April 28, 2011, the Corps approved a proposal to raise the water levels in Eagle Lake to over 90 feet. Joint Ex. 163. The flooding of Eagle Lake destroyed many of plaintiffs' piers, boathouses, and docks, costing plaintiffs many thousands of dollars. Pls.' Brief at 7–9.[1] Initially, after the flood damage, the Corps distributed claim forms to plaintiffs. *See*, *e.g.*, Joint Ex. 31. The government, however, denied compensation for those claims. *See, e.g.*, Joint Ex. 30. As a result, this action ensued.

The reason the government took the flooding action goes back over a year before the government flooded Eagle Lake. *See* Joint Ex. 95 at 1–2. In February of 2010, sand boils[2] were found on property adjacent to the levee in the Buck Chute area, which was part of the Mississippi River levee system. Pls.' Brief at 5; Tr. 840:8–20. These sand boils indicated that the levee was being undercut by pressure from the river and might break, flooding a very large area of about a million acres and possibly between four thousand to six thousand homes and businesses. Tr. 292:14–18, 1309:14–22, 1441:11–14; Joint Ex. 78; Joint Ex. 156.

The Corps studied the sand boils and the area adjacent to the levee for more than a year. *See* Tr. 1003:16–19. In 2011, very wet weather caused an unusual level for the annual flood stage of the river. Water pressures were raised to a dangerous level against the levee. Tr. 856:16–20. The Corps' experts determined that raising the Lake to more than 90 feet would counteract the pressure and likely preserve the levee. *See* Joint Ex. 163. A decision was made to raise the Lake, knowing plaintiffs' properties would be damaged. *Id.* Experts projected that the likelihood of breach was over 95% before the Corps flooded Eagle Lake. Joint Ex. 72 at 51;

---

[1] Citing, *inter alia*, real estate appraisal expert Robert L. Crook's just compensation opinions on plaintiffs' properties. *See* Joint Ex. 42; Joint Ex. 46; Joint Ex. 47.

[2] As explained by Dr. Shewbridge,

> A sand boil is a bubbling spring of water sometimes several feet in diameter that bursts through the ground often near the land-side toe of a levee. Fast flowing water from the spring can cause migration of sand and silt from the underlying aquifer, causing it to "boil" out of the ground, which in turn can result in the formation of a void or "pipe" below the boil. If a pipe forms and progresses through the aquifer to the river and continues to enlarge from erosion, it can eventually cause a collapse of the overlying levee embankment, leading to land-side slope instability, overtopping erosion and subsequent breach of the levee. This is referred to as "Backwards Erosion Piping."

Def. Ex. 40 at 14.

Joint Ex. 85 at 45:10–23; Def. Ex. 40 at 30; Tr. 1057:4–1062:1, 1084:19–1085:5, 1438:21–25. Plaintiffs do not challenge this evidence.

## II.     Discussion

The Takings Clause of the Fifth Amendment of the Constitution prohibits the United States government from taking private property for public use without "just compensation." U.S. Const. amend. V.  "A compensable taking of property occurs when society imposes a burden on an individual's property which, in fairness and justice, society itself should bear." *Bassett v. United States*, 55 Fed. Cl. 63, 67 (2002).  This Court's jurisdictional grant provides it with the power to decide claims based on the Takings Clause of the Fifth Amendment.

### A.  Liability

As a principle, the right to control one's private property is paramount to the existence of our Nation.  A government should strive to protect, rather than destroy personal property.  JOHN LOCKE, TWO TREATISES ON GOVERNMENT §§ 124, 201, 222.  The Court must analyze takings claims regardless of the consequences to governmental policy.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982) ("[A] permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve."). "Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of per se rules." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).

It is clear in this case that the government knowingly took action that destroyed some of the plaintiffs' property, and that this was done for a public purpose.  It is also clear the property, the docks, piers, and boathouses were destroyed by the government's action.  Thus, the only issue remaining before this Court is whether the government is required to compensate plaintiffs for their loss.  The government has two principle arguments for why compensation is not required in this case.  The first is that the action taken by the Corps was in an emergency situation triggering the doctrine of necessity.  The doctrine of necessity presupposes an almost instantaneous decision to act.  *See Trin-Co Inv. Co. v. United States*, 130 Fed. Cl. 592, 599 (2017).  Here the Court finds that the facts do not meet the conditions required for the doctrine of necessity to apply.  The Corps was aware of the sand boils and potential dangers for over a year before ultimately flooding Eagle Lake.  In fact, the government carefully analyzed its options and chose the most cost effective one to immediately reduce the likelihood of a levee breach.

The government considered its options carefully and deliberately over a period of more than a year, from early in 2010 to Spring of 2011.  It chose the most effective and cost-efficient way of dealing with the problem.  The flooding of Eagle Lake served as a temporary stay of the danger while a more permanent solution at a cost of $2.7 million occurred after the Mississippi River's flood stage abated.  If this kind of "emergency" justifies an exemption from the Taking

clause of the Fifth Amendment, then many large government projects would similarly be insulated when private land or resources are needed.

The government's second argument is that the doctrine of relative benefits applies, as the plaintiffs are in a better position than they would have been if the levee had breached. It is certainly true that in the hypothetical world where the breach occurred, the plaintiffs would have been far worse off, along with 10,000 other citizens. In the real world, however, all 10,000 other citizens were unaffected, but the plaintiffs' properties were significantly damaged. The government is applying a hypothetical situation to discount the harm plaintiffs suffered in the real world. The central purpose of the Fifth Amendment is to ensure that discrete minorities do not bear the burden of benefits to the general public. Few cases present this problem as starkly as this case. "The Takings Clause is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

Of course, it has long been a principle that a fire department, during times of fire, may knock down your property without compensation to stop the flames from engulfing more of the city. *See generally Respublica v. Sparhawk*, 1 U.S. 357, 363 (1788). This is an old concept. Here, of course, the problem (our fire analogue) began over a year before the "knock down" or Lake flooding. The government studied the problem for a long time, and experts recommended a solution. The government thought about the solution for quite a while, and determined it was an efficient way to solve the problem, with the exception of damaging plaintiffs' properties. This was economically efficient and resulted in significant benefits. Plaintiffs only ask that they are compensated for their loss, which helped procure those benefits.

The government makes another series of arguments that compensation should not be awarded under the Fifth Amendment. It argues that plaintiffs' received benefits from the government's actions. There are really two benefit arguments. First there is the general benefit that comes from either the government's building of the levee system or the operation of the Muddy Bayou Control Structure. It is certainly true that these structures benefitted the plaintiffs, most of the Mississippi Delta population, and the region's economy. However, one should not stop there. The United States' military keeps the region from being overrun by foreign governments and perhaps pirates. Government programs benefit all citizens in various ways. If the benefits citizens get from the federal government are to be put on the scale in a taking case, the citizen would always lose, particularly anywhere along the several thousand miles of the Mississippi River system.

The second version of the government's argument presents a more serious question. If the levee had broken, would plaintiffs have suffered more serious damage than they actually did? It seems to this Court that the answer is clearly yes! Plaintiffs' property would have been totally inundated, not just the piers and boat houses. However, the Court will not conflate the real world with a theoretical one. The levee did not break. A million acres were dry and snug. People

were not in wet houses sweeping out mud, but enjoying their normal life. They had no damage to their property. Only this small band of plaintiffs had damage. Thus, the government argues that the damage plaintiffs would have suffered in this never-was world must offset the damage actually inflicted upon this group of plaintiffs in the real world. This argument seems to turn the Fifth Amendment on its head.

### B. Damages

The Takings Clause of the Fifth Amendment provides just compensation as the exclusive remedy. "The guiding principle of just compensation is reimbursement to the owner for the property interest taken." *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961). Landowners are entitled to the fair market value of their land, which is "'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979) (quoting *United States v. Miller*, 317 U.S. 369, 374 (1943)). "[I]n the easement context, the conventional method of valuation is the before-and-after method, i.e., the difference between the value of the property before and after the Government's easement was imposed." *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015).

The Court finds that a "before-and-after" Fair Market Value method of calculation for each plaintiff's property should be used to determine just compensation. However, the Court finds that the "before" calculation should not rely on the hypothetical expectation that the levee would have breached. Accordingly, the Court finds that the "before" calculation should be the value of the property immediately before the flooding of Eagle Lake. For these valuations, the Court bases its just compensation award on Mr. Parker's findings.

Plaintiffs and defendant submitted damage calculations in their Post-Trial Briefs relying on different expert witness opinions. *See generally* Joint Exs. 42, 43, 46, 47; *see also* Joint Exs. 156, 157, 158; Tr. 1535:4. Defendant's and plaintiffs' figures calculated the damages to each individual plaintiff's property. *See generally* Joint Exs. 42, 43, 46, 47. Plaintiffs' damages calculations were performed by plaintiffs' real estate appraisal expert, Robert Crook ("Mr. Crook"), in 2016. *See* Pls.' Brief at 22. For each individual property, Mr. Crook calculated the difference in the Fair Market Value of the property before the flood and the Fair Market Value of the property after the flood. *See id.* During his appraisal, Mr. Crook discovered the following valuations for damages to plaintiffs' properties. First, Mr. Crook found that the Fair Market Value of the damage to the Alford property was $26,000. *See* Joint Ex. 42. The damage to the Wilson property was found to be in the amount of $19,400. *See* Joint Ex. 43. In addition to damages allocated to the Wilsons' residential property, the Wilsons claim $36,404 in lost profits from their business due to the flooding. *See id.* Next, Mr. Crook determined that the just compensation due to the Brinkmanns was $71,500. *See* Joint Ex. 46. Mr. Crook also evaluated the property owned by Eagle Lake View Properties, LLC of which Kelly MacNealy is the managing member. *See* Joint Ex. 47. For the Eagle Lake View Property, Mr. Crook utilized the sales comparison approach in determining the "before" market value of the property, which relies on the "highest and best value" use of the property in determining valuation. *See* Joint Ex.

47 at 15. Using this approach, he arrived at a total of $175,000 worth of damage as a result of the 2011 flood. *See* Joint Ex. 47. The Sills property did not incur any damage to the residence. *See* Tr. 1598:14–19. Plaintiff Sills, however, claims damage for the cost of having to evacuate her home. *See id.* Separately, plaintiff Chaney filed two claims for damages to his property. *See* Plaintiff Chaney's Joinder to Plaintiff's Post-Trial Brief (hereinafter "Chaney Brief") at 2. "The first claim was for $20,943.50 in physical damage." *See id.* The second claim was for $19,350 representing the valuation of the loss and enjoyment of his property. *See id.*

Defendant argues that the Court should rely on the figures produced by Mr. Parker in calculating the "before" and "after" Fair Market Values of the MacNealy, Wilson, and Brinkmann properties. *See id.* at 46. Mr. Parker valued the damages to the MacNealy property at $79,000. *See* Tr. at 1587:4 to 1588:17; Tr. at 1593:11–14 (finding the Fair Market Value before the taking to be $200,000 and the Fair Market Value after the taking to be $121,000). According to Mr. Parker, the amount of damage to the Wilson property was $13,000. *See* Tr. at 1607:7–12. The value of the damage to the Brinkmann property was $25,000. *See* Tr. 1573:18–21. Defendant does not contest the Fair Market Value calculations provided by Mr. Crook for the Alford and Chaney properties. *See* Def.'s Brief at 46. The Court accepts the findings of Mr. Parker in determining the just compensation for each plaintiff.

Finally, "[i]t is a well settled principle of Fifth Amendment taking law, . . . that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking." *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949)). Therefore, plaintiff Wilson's claim for lost profits is rejected, as lost profits fall under the purview of consequential damages. Plaintiff Chaney's claim for the loss of use and enjoyment of his property also falls under consequential damages, and therefore, his claim for $19,350 is rejected. Additionally, just compensation may only be given for actions by the federal government and not for actions by third parties. *See Agee v. United States*, 72 Fed. Cl. 284, 288 (2006). During the 2011 flood, Warren County, not the federal government, issued evacuation orders. *See* Joint Ex. 164; Tr. at 990:3–21; Def. Ex. 55; Tr. at 992:8–15. Therefore, plaintiff Sills' claim for damages must be rejected.

Excluding consequential damages claimed by plaintiff Wilson and plaintiff Chaney, and third-party damages claimed by plaintiff Sills, the Court calculates plaintiffs' just compensation award based on Mr. Parker's findings pursuant to the chart below.

| Property | FMV before Flood | FMV after Flood | Just Compensation |
|---|---|---|---|
| Alford | $272,000 | $246,000 | $26,000 |
| Brinkmann | $205,000 | $180,000 | $25,000 |
| Chaney | $210,000 | $185,000 | $25,000 |
| MacNealy | $200,000 | $121,000 | $79,000 |
| Wilson (residence) | $170,000 | $157,000 | $13,000 |

Accordingly, the Court awards plaintiffs $168,000 plus interest, using the interest calculations set forth in the Declaration of Takings Act from April 30, 2011 until the date of payment.  *See* 40 U.S.C. § 3116.  The parties are directed to submit, within sixty days, a stipulation as to the interest at the end of the sixty-day period, as well as attorneys' fees pursuant to the Uniform Relocation Act.

### III.    Conclusion

For the reasons set forth above, plaintiffs are awarded $168,000 plus interest.  Pursuant to Rule 54(b) of the Rules of the Court of Federal Claims, there being no just reason for delay, the Court directs the Clerk of Court to enter judgment in favor of plaintiffs, consistent with this Order.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge